# UNITED STATES DISTRICT COURT
# DISTRICT OF MAINE

| | |
|---|---|
| DENNIS BOUYEA, | )<br>) |
| Plaintiff, | )<br>) |
| v. | ) Docket No. 2:17-cv-214-NT<br>) |
| METZ CULINARY MANAGEMENT, INC., | )<br>)<br>) |
| Defendant. | ) |

## ORDER ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

In this action, Plaintiff Dennis Bouyea ("**Bouyea**") claims that Metz Culinary Management, Inc. ("**Metz**"), violated the Maine Human Rights Act ("**MHRA**"), 5 M.R.S. § 4451 *et. seq.*, and the Age Discrimination in Employment Act ("**ADEA**"), 29 U.S.C. § 621 *et. seq.*, by unlawfully terminating his employment based on his age. Compl. ¶ 8 (ECF No. 3-2). Metz now moves for summary judgment. Def.'s. Mot. (ECF No. 24). For the reasons set out below, and after reviewing the pleadings and the record in its entirety, I **DENY** Metz's motion.

## FACTUAL BACKGROUND

On approximately June 23, 2015, Metz terminated the employment of Dennis Bouyea, who had worked at St. Mary's Health System in Lewiston, Maine since 1987. Joint Statement of Material Facts ¶¶ 34, 48 (ECF No. 48) ("**JSMF**"). St Mary's chose Metz, a Pennsylvania-based corporation, to take over its nutrition service (which previously operated in-house) in January 2013. JSMF ¶¶ 1-2. Metz hired Bouyea as General Manager of the St. Mary's account on January 20, 2013, because St. Mary's requested that Metz retain all food service management staff. JSMF ¶¶ 3, 45. Metz's

contract with St. Mary's stipulated that employees like Bouyea would be retained with their pre-existing salaries, benefits, and seniority. JSMF ¶ 45. Also incorporated into the contract was a provision allowing St. Mary's to give formal notice of performance issues or deficiencies. JSMF ¶ 55. This provision was never invoked during Bouyea's time at Metz. JSMF ¶ 55.

During the relevant time period, St. Mary's food service areas included: (1) Campus Cuisine, the main kitchen, located in an apartment building for the elderly; (2) the apartment building's main dining room; (3) the Market Café, located in the hospital building; (4) a galley kitchen on the hospital's third floor; and (5) seven dining areas located in the D'Youville Pavilion. JSMF ¶ 75.

**I. The Transition**

By all accounts, Bouyea played a pivotal role in helping ensure a smooth transition. In December 2013, he received a letter commending his handling of the change. JSMF ¶ 50. Citing Bouyea's "incredible work," the letter enclosed a bonus and stated that the prior year was "filled with many successes." JSMF ¶ 51. It singled out Bouyea for exemplary performance, including "leading the department through tremendous change" and completing "incredible work" on the new in-house Market Street Café, which had replaced a Dunkin' Donuts. JSMF ¶¶ 46, 50.

Changes in the management structure followed the transition. First, in January 2013, District Manager Ray Farrow became Bouyea's direct supervisor. JSMF ¶ 5. Second, Metz's point of contact changed after St. Mary's hired Philip

Hickey, in late 2014 or early 2015, as its new vice president of elder care services. JSMF ¶¶ 8, 52. Hickey was put in charge of the D'Youville Pavilion. JSMF ¶ 8.

Initially, Farrow and Bouyea seem to have shared a relatively cordial relationship. Tensions emerged after Hickey became vice president. JSMF ¶ 4. Bouyea alleges that he overheard Farrow make several age-related comments about St. Mary's workforce. JSMF ¶ 62. Such comments included that "[h]e couldn't understand why the people that are over 40 are still doing salad prep or scooping muffins in the bakeshop." Bouyea Dep. 178:15-17 (ECF No. 23-12); *see also* Bouyea Aff. ¶ 30 (ECF No. 28-1) ("Ray Farrow questioned why older individuals remained in entry-level positions."). Metz denies that Farrow made comments directly related to age, but admits he mentioned that the salad prep workers had been at the hospital for a long time, that they topped the pay scale, and that Metz could probably replace two salad people with one chef to save money. JSMF ¶ 63.

## II. The Termination & Preceding Events

### A. Metz's Failures to Meet Budget

From a financial standpoint, the transition was bumpy from the start. In 2013 and 2014, Metz repaid $25,000 of its management fees for each year due to budgetary shortfalls. JSMF ¶ 65. Despite the rough financial start, things gradually began improving. In 2014, the company served more meals than expected. JSMF ¶ 68. According to Metz's Senior Vice President Craig Solomon, Metz anticipated that increased volume would contribute to revenue growth. *See* Solomon Dep. 14:15-22 (ECF No. 23-1). Judged from a cost-per-meal perspective, the 2014 numbers met

3

budget. JSMF ¶ 69.[1] Things took a more concrete turn for the better by March 2015. JSMF ¶ 71. In his District Manager Report of April 14 and 15, 2015, Farrow wrote that Metz met budget: "March 2015 will go down in history as the FIRST time that both Campus Cuisine and Market Street met and exceeded budget targets!" [2] JSMF ¶ 71.

Although Bouyea knew that client satisfaction—including matching budget goals—was important to his role at Metz,[3] he was not solely responsible for budgeting.[4] Several matters that were entirely out of Bouyea's hands contributed to Metz's financial struggles. For example, Bouyea played no part in the decisions to negotiate a fixed-price contract or to replace the Dunkin' Donuts with the Market Street Café, which caused budget shortfalls. JSMF ¶ 67. Similarly, Metz's inability to downsize due to its obligation to retain St. Mary's management with their pre-existing salaries and benefits was unique to the St. Mary's contract. *See* Solomon Dep. 10:16-24, 19:12-14, 20:2-25, 21:9-13.

---

[1]   In arguing that St. Mary's should not have to repay any of its 2014 management fee, Farrow noted that Metz was under budget from a volume-based perspective. JSMF ¶ 70. St. Mary's, however, took the position that the budget had not been met because Metz had negotiated a fixed-price contract. JSMF ¶ 70.

[2]   Bouyea and his management team received a raise of 4 % in 2015. JSMF ¶ 60.

[3]   As the General Manager, Bouyea was expected to develop plans to meet the client's objectives "in conjunction with [his] supervisor"—in this case, Farrow. JSMF ¶ 6. Bouyea and Farrow discussed the need to improve financial performance throughout the first half of 2015. JSMF ¶ 12.

[4]   For 2014 and 2015 the budget was developed at the "unit" level, meaning that decisions were made by "the [general] manager [Bouyea], the district manager, and the client [St. Mary's]." Solomon Dep. 37:10-14 (ECF No. 23-1).

In February of 2015, Farrow wrote a largely-positive evaluation of Bouyea. *See* JSMF ¶ 57. That evaluation included phrases such as "100 [percent] compliant," "excellent," "very detail-oriented," "moving in the right direction," "consistently meet[s] and exceed[s] expectations," "worked very hard at perfecting the programs at MSC [Market Street Café] and CC [Campus Cuisine]," "high standard of performance/results for his team," "moving in the right direction," and "a pleasure to have on my team and an asset to [Metz]."[5] JSMF ¶ 58.

On March 20, 2015, Farrow asked to speak with Hickey "privately about your impressions of Dennis Bouyea in your dealings with him thus far." JSMF ¶ 72. On April 13, 2015, Farrow sent an email to Hickey indicating that he wanted to set a 60-day target with Bouyea for hitting budget and a 30-day target for hitting other goals. JSMF ¶ 90. In that same email, Farrow indicated that he would be actively recruiting for a "temporary (and permanent) replacement" of Bouyea. JSMF ¶ 90. Farrow also noted in the April 13 email that he had clarified "the severity of the issues (financial and other) with Dennis." Ex. 8 (ECF No. 23-8). Farrow had emailed Bouyea on March 31, 2015 to express disappointment with that month's budget performance. JSMF ¶ 15.[6]

---

[5] Bouyea received a score of 2 out of 5 in the financial category. JSMF ¶ 13.

[6] The email contrasts with Farrow's April 2015 District Manager Report touting the fact that, the prior month, Metz had exceeded budget targets for the first time for both Campus Cuisine and Market Street. JSMF ¶71.

5

**B. The Maine Department of Health and Human Services Inspection**

Events took a turn for the worse on May 27, 2015, when the Maine Department of Health and Human Services ("**DHHS**") visited St. Mary's D'Youville Pavilion. JSMF ¶ 83. Subsequent to that visit, DHHS issued a Statement of Deficiencies and Plan of Correction. JSMF ¶83. Although the parties dispute which specific areas cited in the report were Metz's versus St. Mary's responsibilities, it is undisputed that Metz and St. Mary's were in joint control of certain areas cited by DHHS. *See* JSMF ¶¶ 75-89. DHHS cited the D'Youville Pavilion for numerous deficiencies unrelated to Metz going back to 2013, and D'Youville was under a plan of correction for such deficiencies from 2014 to early 2015. JSMF ¶ 81.

Items that were at least partially Metz's responsibility included "1) a soiled dustpan and broom on the windowsill[;] 2) coffee film on coffee pots; 3) [a] splash under the tray lines"; 4) unwiped microwaves, and 5) a grease-encrusted oven or stove. JSMF ¶ 88. Hickey initially misunderstood which items were under Metz's control. JSMF ¶ 86. During a meeting of department heads in late May, Bouyea corrected this misunderstanding and offered his view of which items were not Metz's responsibility. JSMF ¶ 87.

**C. The Termination**

On or about June 23, 2015, Farrow met with Bouyea to inform him of his termination. JSMF ¶ 34. During the meeting, Farrow mentioned the need for a fresh

6

or new set of eyes and commented that Bouyea had been in his position for more than 30 years. JSMF ¶ 5. Farrow also informed Bouyea that he would be replaced by Adam Gonzalez. JSMF ¶ 34. Bouyea was told that he could apply for another General Manager position at a Metz account in Canton, Ohio. JSMF ¶ 37. Bouyea was surprised to learn at his termination meeting that Hickey had been interested in firing him. JSMF ¶ 95. He testified that Hickey never set foot in the kitchen. Bouyea Aff. ¶ 11. The actual termination took place on June 25, 2015, after a telephone conversation with Metz's Vice President of Human Resources, Cheryl McCann, and Solomon. JSMF ¶ 38.

In June 2014, Metz terminated another manager who was born in 1980 from an account managed by Farrow. JSMF ¶ 91. Unlike Bouyea, this manager was put on a performance improvement plan before his termination, which occurred after an Indiana Department of Health Inspection found fourteen violations, some of which were classified as more critical than those uncovered during the inspection at St. Mary's, and some of which dealt with food preparation and serving.[7] JSMF ¶ 93.

Bouyea was born in 1957; Gonzalez, his replacement, was born in 1964. JSMF ¶¶ 39-40. Since the events spawning this litigation, Gonzalez has been replaced as General Manager of the St. Mary's account by Bill Anderson, who is older than either predecessor. JSMF ¶ 41. Farrow and Hickey have stated that they had assumed

---

[7] Violations included: "the person-in-charge did not demonstrate knowledge of food borne disease prevention," "the Food Director indicated staff do not sign the Health Awareness Food Employee Reporting Agreement as required," "[f]ood and food-contact items were coming in contact with non-food items," the use of incorrect food temperatures and cooling methods, and the use of expired food. JSMF ¶ 94.

7

Gonzalez and Bouyea were either the same age or that Bouyea was younger. JSMF ¶ 33. Between March 2015 and July 2016, six other employees above 40 were either terminated or left their positions after Bouyea's departure. JSMF ¶¶ 97-98.[8]

After Bouyea left, St. Mary's CEO Lee Myles, who was vacationing at the time of the termination, sent Bouyea a letter thanking him for his years of service and expressing surprise regarding his departure. JSMF ¶ 100. Solomon testified that Bouyea was well-known and well-liked at St. Mary's. JSMF ¶ 100.

## LEGAL STANDARD

Summary judgment is appropriate when there is no genuine dispute of material fact and the moving party is therefore entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A dispute is "genuine" where a reasonable jury could resolve the point in question in favor of either party. *Oahn Nguyen Chung v. StudentCity.com, Inc.*, 854 F.3d 97, 101 (1st Cir. 2017). A fact is "material" where it could influence the outcome of the litigation. *Id.* The moving party may establish that there is no genuine dispute of material fact by "affirmatively produc[ing] evidence that negates an essential element of the non-moving party's claim," or by "using 'evidentiary materials already on file . . . [to] demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" *Ocasio-Hernandez v. Fortuño-Burset*, 777 F.3d 1, 4-5 (1st Cir. 2015) (citation omitted). This burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is

---

[8] Bouyea maintains that after the final termination, the average age of all managers had declined by 9 years, from 51 to 42. JSMF ¶ 98.

an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986). On a motion for summary judgment, courts must construe the record in the light most favorable to the non-movant and resolve all reasonable inferences in the non-movant's favor. *Burns v. Johnson*, 829 F.3d 1, 8 (1st Cir. 2016).

## DISCUSSION

It is a violation of the ADEA and MHRA for an employer to refuse to hire, to discriminate against, or to discharge any individual because of that person's age. *See* 29 U.S.C. § 623(a)(1); 5 M.R.S. § 4572(1)(A).[9] Successful plaintiffs must establish that "age was the 'but-for cause' of the employer's adverse action." *Gross v. FBL Fin.*, 129 S. Ct. 2343, 2351 (2009). "As in other discrimination cases, ADEA plaintiffs will rarely possess 'smoking gun' evidence to prove their employers' discriminatory motivations." *Vélez v. Thermo King de Puerto Rico*, 585 F.3d 441, 446 (1st Cir. 2009). Therefore, when evaluating ADEA claims that lack direct evidence[10] of age discrimination, "plaintiffs . . . may nonetheless prove their cases by using the three stage burden-shifting framework set forth by the Supreme Court in *McDonnell Douglas Corp v. Green*, 411 U.S. 792 (1973)." *Id.* at 446-47.

Metz has moved for summary judgment on Bouyea's age discrimination claim, advancing three principle arguments: 1) that Bouyea was not replaced by a

---

[9] Maine courts have consistently applied the MHRA in accordance with the ADEA and other federal anti-discrimination statutes. *Forrest v. Brinker Intern. Payroll Co., LP*, 511 F.3d 225, 228 n.1 (1st Cir. 2007). The chief distinction between the statutes involves coverage; the MHRA protects individuals regardless of age, whereas the ADEA only covers employees over forty.

[10] Bouyea has offered some evidence that could be characterized as direct.

9

"substantially younger" individual as required to establish a prima facie case;[11] 2) that Bouyea's performance did not meet the Defendant's legitimate expectations as required to establish a prima facie case; and 3) that even if Bouyea is able to establish a prima facie case of age discrimination, Metz had a legitimate, non-discriminatory reason to terminate his employment, and this reason was not a pretext. The Defendant maintains that there is no genuine dispute of material fact as to any of the above three issues. I examine each issue in turn.

I. **Whether the Age Difference between Bouyea and his Replacement is Sufficient to Support a *Prima Facie* Case of Age Discrimination**

Bouyea's replacement was six years younger than him. In *O'Connor v. Consolidated Coin Caterers Corp.*, the Supreme Court held that an inference of age discrimination is unsupported by the "replacement of one worker with another worker insignificantly younger." 517 U.S. 308, 313 (1996). The Defendant offers no controlling case law for its claim that the Plaintiff's replacement was not "substantially younger" as a matter of law. The First Circuit has found a difference of three years to be "insufficient to support a prima facie case of age discrimination," *Williams v. Raytheon Co.*, 220 F.3d 16, 20 (1st Cir. 2000), and it has found a seven-year age difference to be sufficient. *Rivera-Rodriguez v. Frito Lay Snacks Caribbean*, 265 F.3d 15, 23 (1st Cir. 2001). This Court has found a five-and-a-half-year age difference sufficient to support a *prima facie* case. *Deslauriers v. Napolitano*, 738 F.

---

[11] The basic elements of a prima facie case of age discrimination are: (1) the plaintiff is a member of a protected age group, (2) the plaintiff was qualified for the position in question, (3) despite being qualified, the plaintiff was adversely affected, and (4) a younger person with similar or lesser qualifications was treated more favorably than the plaintiff. *See, e.g.*, *Mendez-Martinez v. Caribbean All. Ins. Co.,* 851 F. Supp. 2d 336, 344 (D.P.R. 2012).

Supp. 2d, 162, 176-77 (D. Me. 2010). "Although some Circuits require a greater age difference [than five years], the First Circuit does not." *Id.* at 177.

Whether a comparator above 40 is "substantially" younger for ADEA purposes is determined on a case-by-case basis. Confronted with relatively small age differences, courts consider whether other evidence suggests that an employer considered age to be significant. *See Nembhard v. Memorial Sloan-Kettering Cancer Ctr.*, 104 F.3d 353 (2d Cir. 1996) (affirming, in the wake of *O'Connor*, the district court's decision that when significant evidence of discriminatory intent exists, a *one-year* age differential does not preclude a finding of age discrimination). A factfinder could reasonably infer that Metz considered age to be significant from Farrow's general comments about the food workers and from his specific comments to Bouyea such as needing "fresh eyes."

Even after *O'Connor,* there is simply no "magical formula" for determining whether a "particular age gap" can support an inference of age discrimination. *Barber v. CSX Dist. Servs.*, 68 F.3d 694, 699 (3d Cir. 1995). Because Gonzalez was six years younger than Bouyea, and because there is additional evidence suggesting that Metz considered age important, Plaintiff has established a triable issue on this point.[12]

---

[12] Metz's point that the current General Manager is older than both Bouyea and Gonzalez is not dispositive. That Metz later replaced Gonzalez with an older employee is insufficient to dismiss an ADEA claim. *See, e.g.*, *McCarthy v. New York City Tech. Coll.*, 202 F.3d 161, 165 (2d Cir. 2000) (noting that while hiring an older replacement is typically fatal to an ADEA claim, a plaintiff can nonetheless succeed by demonstrating an employer's conduct was subterfuge to avert an age discrimination claim).

11

## II. Whether Bouyea's Performance Met Metz's Legitimate Expectations

To make out a prima facie case of age discrimination, a plaintiff need only meet the low bar of demonstrating that he was "qualified" for the position. *See Texas Dep't. of County Affairs v. Burdine*, 450 U.S. 248, 253 (1981). This burden is "not onerous" and a relatively basic showing is enough for a plaintiff to demonstrate that an adversely affected employee was qualified. *Williams*, 220 F.3d at 19.[13]

Bouyea points to sufficient facts in the record to clear this low hurdle. He received a letter of commendation for his work at the end of 2013 that singled him out for exemplary performance. He was by most accounts a hard worker who was performing well in all of his responsibilities except, perhaps, budgeting. JSMF ¶ 13. And he received a largely positive evaluation in February of 2015. JSMF ¶¶ 57-58. The parties dispute whether certain expectations were communicated to Bouyea, JSMF ¶ 17. Although budget concerns may have been communicated to Bouyea, record evidence suggests that Bouyea lacked control over many aspects of budgeting and that the budget was trending upwards nonetheless. *See, e.g.*, JSMF ¶¶ 13-15. Further, disagreement exists regarding the nature of the DHHS violations and who was responsible for them. *See, e.g.*, JSMF ¶ 81.

---

[13] Evidence that a plaintiff was not qualified based on the employer's *subjective* expectations—or on its subjective assessment of the plaintiff—is reserved, when the burden-shifting *McDonnell Douglas* analysis applies, for the pretext stage. *See, e.g.*, *Slattery v. Swiss Reinsurance Am. Corp.*, 248 F.3d 87, 91-92 (2d Cir. 2003) (holding that at the *prima facie* stage a plaintiff is not required to show that he was "performing satisfactorily" and need only demonstrate that he possesses the basic skills necessary to performing the job).

The Defendant alleges that Hickey was dissatisfied with Bouyea's attention to detail, yet Farrow—who ultimately made the decision to terminate Bouyea's employment—wrote that Bouyea was "very detail-oriented." JSMF ¶ 19. On this record, Bouyea has raised a triable issue on whether he was qualified and cleared the hurdle of establishing a prima facie case of age discrimination.

### III. Whether Metz's Reasons for Terminating Bouyea Were Legitimate and Non-Discriminatory and Were Not a Pretext

The Defendant argues that there is "ample" evidence of a legitimate, non-discriminatory reason, and "no evidence that reason is a pretext." Def.'s Mot. 12. Metz contends that it fired Bouyea because of (1) "undisputed budget issues," (2) a DHHS audit citing violations in areas within Bouyea's responsibility and, critically, (3) "a specific request from the client [*i.e.*, Hickey] that Plaintiff be removed from the account." Def.'s Mot. 12. Metz has offered enough evidence to satisfy its undemanding burden of production in proffering legitimate, non-discriminatory reasons for the termination.

But whether those reasons were pretextual is a matter in dispute. I have already discussed the parties' disputes surrounding the budget and who bore responsibility for the deficiencies noted by DHHS. Whether Hickey asked to have Bouyea removed is also disputed. Although Hickey now avers that he requested to have Bouyea removed, taking the evidence in the light most favorable to the Plaintiff, a jury could conclude otherwise. There is no written evidence supporting Hickey's claim that he wanted to see Bouyea fired, and the written emails that exist show

Farrow hinting at firing Bouyea as early as April and requesting a "private" meeting with Hickey to discuss Bouyea's performance. *See* JSMF ¶ 72.

Further evidence suggests that Metz's proffered reasons for terminating Bouyea could have been pretextual. Farrow's comments during the termination that Bouyea had been around for 30 years and that the company needed "fresh eyes" could suggest an ulterior motive. Finally, the Plaintiff's evidence of prior commendations and the letter written by St. Mary's CEO expressing surprise at Bouyea's termination and thanking him for his "wonderful years of service" could allow a juror to draw an inference that something other than performance was motivating the decision. JSMF ¶ 100; Ex. 11 (ECF No. 23-11).

Courts should be "'particularly cautious' about granting [an] employer's motion for summary judgment" in cases where a plaintiff has made out a prima facie case of age discrimination and where the issue has therefore become "whether the employer's stated nondiscriminatory reason is a pretext for discrimination." *Soto-Feliciano v. Villa Cofresí Hotels, Inc.*, 779 F.3d 19, 25 (1st Cir. 2015) (quoting *Hodgens v. General Dynamics Corp.*, 144 F.3d 151, 167 (1st Cir. 1998)). On this record, I cannot conclude that summary judgment is warranted.

## CONCLUSION

For the reasons stated above, the Defendant's Motion is **DENIED.**

SO ORDERED.

/s/ Nancy Torresen  
United States Chief District Judge

Dated this 4th day of December, 2018.